FILED

**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

03 APR 22 Fii 3:36

MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

NATIONAL ASSOCIATION OF
PROFESSIONAL ALLSTATE AGENTS,
a New York corporation,

      Plaintiff,

v.                               Case No. 8:01-cv-2137-T-24 MSS

ALLSTATE INSURANCE COMPANY,
an Illinois corporation,

      Defendant.

_____/

## **ORDER**

      This cause comes before the Court for consideration of Defendant's Motion for Summary Judgment. (Doc. No. 55). Plaintiff filed a response in opposition to Defendant's motion (Doc. No. 67) and a Motion for Summary Judgment on Counts I, IV, and V of the First Amended Complaint. (Doc. No. 59). Defendant subsequently filed a response in opposition to Plaintiff's Motion for Partial Summary Judgment. (Doc. No. 71).

## I.    **Factual Background**

      Plaintiff is a not-for-profit professional trade association with members nationwide, including members in Florida. (First Am. Comp., Doc. No. 26 at 2). Defendant, including its affiliates and subsidiaries, is an insurance and financial services company that designs, creates, and sells insurance and financial products throughout the country, including the state of Florida. (Jt. Stmt. of Undisputed Facts, Doc. No. 62 at 1). In Florida, Defendant distributes its insurance and financial products principally through independent contractor agents, called Exclusive



Agents or "EAs." See id. The relationship between the EAs and Defendant is governed by the R3001 Exclusive Agent Independent Contractor Agreement ("Agreement"). See id. Defendant historically has operated with a workforce comprised of employee agents. (Doc. No. 26 at 3). Throughout the 1990's, Defendant encouraged these employee agents to terminate their written employment contracts and become independent contractors or EAs. See id. Then on November 10, 1999, Defendant announced the reorganization of its agency programs that would eliminate its employee agent programs and establish the EA program as its principal agency distribution system. (Doc. No. 62 at 2). At the time of this announcement, approximately 60% of Defendant's agents were EAs. See id.

As part of its reorganization, known as "Preparing for the Future," Defendant offered all employee agents the opportunity to become EAs. See id. Employee agents had the option of ending their relationship with Defendant if they elected not to operate as an independent contractor in the EA program.[1] See id. Following the November 10, 1999 announcement of Preparing for the Future, employee agents were provided a package of written information that included: (1) the Preparing for the Future Information Booklet, which contained information about the options available to employee agents, provided an overview of the R3001 Agreement, and previewed what agents could expect under the Agreement; (2) a Conversation Guide that described the process for converting to EA status; (3) copies of the R3001 Agreements; (4) the EA Manual; and (5) the R3001 Supplement. See id. at 2-3. During the month of November 1999, Defendant also conducted meetings throughout Florida to describe to agents the changes

_____

[1] All employee agents were given until June 30, 2000, to decide whether they would become EAs or end their relationships with Defendant's company. (Doc. No. 62 at 2).

that would take place as part of Preparing for the Future.  See id. at 3.  Defendant advised that, as

independent contractors, the agents would have an economic interest in their books of business

and would have the opportunity to sell their economic interest in those books of business.  (Doc.

No. 62 at 3).  As employee agents, the agents did not possess an economic interest in their books

of business and had no right to sell their accounts or any economic interest in them.  See id.  The

Preparing for the Future publication set forth that under the Agreement agents could sell their

interest to qualified buyers approved by the company, that existing independent contractor agents

would be eligible to purchase other agents' books of business (subject to four specific business

requirements), and that agents would have control of their own time.  (Doc. No. 26 at 5).

The Agreement had language confirming the agents' right to transfer their economic

interest to a buyer approved by the Company upon the termination of their Agreement. (Doc. No.

62 at 3).  The Agreement also incorporated an Independent Contractor Manual ("Manual") that

reiterated the agents' right to sell their economic interest to other agents.[2]  (Doc. No. 26 at 6-7).

Furthermore, the Agreement stated that the relationship between the agent and Defendant would

be "that of an independent contractor for all purposes."  See id. at 8.  Defendant elaborated on

this relationship in its Manual, stating that the agents would manage their own time and that

meetings with Defendant's representatives would take place at  "mutually convenient" times.

See id. at 9.  The Manual also set forth that agents possessed "sole and exclusive control" over

---

[2] On December 8, 2000, Defendant issued a memo to all agents in Florida advising them
of new qualifications, effective April 1, 2001, that the company would consider in evaluating
whether prospective agent buyers were qualified to purchase a book of business. (Doc. No. 62 at
4).  The changes to the qualifications were republished in a new version of the EA Manual that
went into effect on January 1, 2002.  See id.

their hours of operation and that the agents should keep their sales locations open for business during times they deemed appropriate for their particular markets. See id.

The Agreement provides that it may also be terminated (1) at any time by mutual agreement of the parties in writing; (2) by either party, with or without cause, with 90-days prior written notice; or (3) immediately by the company, with cause, upon written notice to the EA. (Doc. No. 62 at 5). Furthermore, the Agreement required that the agent meet "certain business objectives established" by Defendant; the Agreement itself, however, did not elaborate on the consequences of an agent's failure to meet these objectives. (Doc. No. 26 at 7). The business objectives were further explained in January of 2000, when Defendant announced the creation of Exclusive Agency Results Measurement ("Results Expectations"). (Doc. No. 62 at 4). Under Results Expectations, agents were measured against Defendant's expected results in three categories: (1) loss ratio; (2) property and casualty (P&C) growth; and (3) Financial Services. See id. Since the introduction of Result Expectations in early 2000, Defendant has terminated the agency agreements of nine agents in Florida for failure to achieve business objectives.[3] See id. at 5.

## II.    **Procedural Background**

On November 9, 2001, Plaintiff filed a nine-count complaint on behalf of its members against Defendant. The original complaint included claims against Defendant for breach of contract, fraudulent inducement, breach of the implied covenant of good faith and fair dealing, and violation of the Florida Franchise Act. (Doc. No. 1). In its April 22, 2002 Order, this Court dismissed Plaintiff's fraudulent inducement claim because it lacked the specificity required by

---

[3] Currently, there are approximately 900 agents in Florida. (Doc. No. 62 at 5).

4

Federal Rule of Civil Procedure 9(b).  (Doc. No. 23, p. 13-14).  This Court also dismissed Plaintiff's individual counts for breach of the implied covenant of good faith and fair dealing as redundant.  See id. at 11-12.  However, the Court granted Plaintiff leave to amend its original complaint.  See id. at 14-15.  Plaintiff thereafter filed an Amended Complaint.  (Doc. No. 26). The Amended Complaint did not include specific counts for breach of the implied covenant of good faith and fair dealing; instead, allegations regarding the implied covenant of good faith and fair dealing were included in the breach of contract claims in Counts I, III, IV, and V.  In the Amended Complaint, Plaintiff also included more specific allegations in its fraudulent inducement claim.  In its September 19, 2002 Order, this Court denied Defendant's Motion to Dismiss Fraudulent Inducement Claim and to Strike Covenant of Good Faith and Fair Dealing Allegations.  (Doc. No. 44).

On December 6, 2002, Defendant filed a Motion for Summary Judgment and Supporting Memorandum of Law (Doc. Nos. 55, 56) and Plaintiff filed its own Motion for Summary Judgment and Supporting Memorandum of Law on Counts I, IV, and V.  (Doc. Nos. 59, 60). The parties also filed a Joint Statement of Undisputed Material Facts on December 6, 2002. (Doc. No. 62).  On December 23, 2002, Plaintiff filed a Brief in Opposition to Defendant's Motion for Summary Judgment.  (Doc. No. 67).  Defendant filed its Opposition to Plaintiff's Motion for Partial Summary Judgment on December 24, 2002.  (Doc. No. 71).

**III.    <u>Standard of Review</u>**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears

5

the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. See Celotex Corp. v. Catrett, 477 U.S. 317 (1986). A moving party discharges its burden on a motion for summary judgment by "showing" or "pointing out" to the Court that there is an absence of evidence to support the non-moving party's case. Id. at 325. Rule 56 permits the moving party to discharge its burden with or without supporting affidavits and to move for summary judgment on the case as a whole or on any claim. See id. When a moving party has discharged its burden, the non-moving party must then "go beyond the pleadings." and by its own affidavits, or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing there is a genuine issue for trial. Id. at 324.

In determining whether the moving party has met its burden of establishing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor. See Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989); Samples on behalf of Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). The Eleventh Circuit has explained the reasonableness standard:

> In deciding whether an inference is reasonable, the Court must "cull the universe of possible inferences from the facts established by weighing each against the abstract standard of reasonableness." [citation omitted]. The opposing party's inferences need not be more probable than those inferences in favor of the movant to create a factual dispute, so long as they reasonably may be drawn from the facts. When more than one inference reasonably can be drawn, it is for the trier of fact to determine the proper one.

WSB-TV v. Lee, 842 F.2d 1266, 1270 (11th Cir. 1988).

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant the summary judgment motion. See Augusta Iron & Steel Works v. Employers Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988). A dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.

## IV.    The Parties' Motions for Summary Judgment

Plaintiff's First Amended Complaint states claims for breach of contract in Counts I, III, IV, and V, a claim for fraudulent inducement in Count II, and a claim for violation of the Florida Franchise Act in Count VI. Defendant now moves this Court to enter summary judgment in its favor on all counts of Plaintiff's First Amended Complaint. Plaintiff also moves this Court to enter summary judgment in its favor on Counts I, IV, and V. This Court will address standing first, then each breach of contract claim before moving on to fraudulent inducement, and finally the Florida Franchise Act.

### A. Standing

For the third time in this lawsuit, Defendant asserts that Plaintiff lacks standing to pursue this action on behalf of its members because Plaintiff's claims require the participation of its individual members. This Court previously held in its April 22, 2002 Order that Plaintiff established associational standing under Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333 (1977) and Florida law. (Doc. No. 23 at 8)("in this instance, the need for individual

7

participation of the injured members is unlikely.  Therefore, since plaintiff seeks only declaratory

relief on a common contract, and since any injuries suffered by individual members are unlikely

to be peculiar, individual participation . . . is not required").  The Court then went through a

detailed analysis of how Plaintiff successfully met all three requirements under Hunt.

On September 17, 2002, this Court issued an Order that reiterated its earlier finding that

Plaintiff possesses sufficient standing under Hunt.  In finding that Plaintiff had standing to

pursue its claims in federal court, this Court made no distinction among Plaintiff's various

claims; rather, the Court found that Plaintiff had standing to pursue its claims. (Doc. No. 44 at 7).

Defendant asserts in its Motion for Summary Judgment that, notwithstanding the Court's

earlier rulings, subsequent discovery and recent case law show that participation by individual,

current and former Allstate agents is essential for the trial of this case, and therefore, Plaintiff

lacks standing to pursue this action on behalf of its members.  Defendant cites to DDFA of S.

Fla., Inc. v. Dunkin' Donuts, Inc., 2002 U.S. Dist. LEXIS 10315 (S.D. Fla. May 22, 2002), in

which an association of Dunkin' Donuts franchisees sought a declaratory judgment against

Dunkin' Donuts for alleged breaches of the franchise agreement and for certain torts.  The Court

found that DDFA had met the first two elements of the Supreme Court's test in Hunt, but failed

the third element because the complaint required individual determinations as to whether the

franchiser committed various torts against certain of its members and whether the members or

the franchiser complied with the provisions of the franchise agreement.

This Court does not find Dunkin' Donuts persuasive because the instant case is readily

distinguished.  For instance, the plaintiff in Dunkin' Donuts did not seek a determination of the

respective rights of the parties under the franchise contract.  There was no significant legal

8

question presented in Dunkin' Donuts concerning what the contract did or did not permit.
Rather, the plaintiff in Dunkin' Donuts sought a *factual* determination that the defendant had, in
fact, engaged in the conduct alleged. 2002 U.S. Dist. LEXIS 10315 at 2.  Because the plaintiff in
Dunkin' Donuts sought to determine what conduct the defendant actually committed,
participation by individual franchises was required and therefore the plaintiff in that case lacked
associational standing.

Plaintiff in the case at bar, however, seeks a determination of whether the contract
permits Defendant's actions, rather than a determination of the nature of those actions.  The
parties in the instant case do not dispute Defendant's actions.  Instead, the parties disagree as to
whether these actions violate the Agreement between the parties.  Accordingly, Plaintiff requests
that this Court determine whether those actions violate the contract.  As such, there is no need for
independent participation of the agents.

Defendant offers, as subsequent discovery, that Plaintiff's Fed. R. Civ. P. 30(b)(6)
witness admitted that Plaintiff has no information on what its members relied upon in their
decision to enter the Agreement, and that the witness readily agreed that to make such a
determination, one would have to look at the individual circumstances of each agent's decision.
(Mathison Depo. at 173:8-14).  Defendant also points to the fact that some of Plaintiff's members
became EAs under the Agreement prior to the Preparing for the Future campaign, and therefore,
could have no claim for fraudulent inducement.  The Court notes that these are the precise issues
that Defendant raised and the Court rejected in its prior Orders.  This Court previously
acknowledged that the "individual participation" prong of the Supreme Court's Hunt test on
standing does not preclude claims where individual members of an association *may* be called to

provide evidence.  Rather, that prong precludes standing in those cases where "the individual

participation of each injured party" is "indispensable to proper resolution of the cause."  Warth v.

Seldin, 422 US 490, 511 (1975).

      The present record amply demonstrates that Plaintiff does not need to call all of its agent

members – nor does it need to call any specific individual member – to prove its claims.  As this

Court previously ruled, "since Plaintiff seeks only declaratory relief on a common contract, and

since any injuries suffered by individual members are unlikely to be peculiar, individual

participation of members is not required."  (Doc. No. 23 at 8).  As such, Plaintiff possesses

sufficient standing to proceed with this lawsuit on behalf of its members.

### B. Breach of Contract

      "Under Florida law, the elements of a breach of contract action are (1) a valid contract;

(2) a material breach; and (3) damages."  Bland v. Freightliner, L.L.C., 206 F. Supp. 2d 1202,

1210 (M.D. Fla. 2002).  The existence of a contract between Plaintiff's agent members in Florida

and Defendant does not appear to be in dispute.  Furthermore, Plaintiff does not seek monetary

damages.  As such, the central issue in dispute in this case is whether Defendant's conduct

constitutes a material breach of the contract.  To resolve this dispute, the Court must examine the

express terms of the contract in light of Defendant's conduct.  If Defendant has not adhered to the

express terms of the contract, the Court must then determine whether such a breach constitutes a

material breach.

### 1. Count I

      In Count I of its First Amended Complaint, Plaintiff seeks a judicial declaration that

Defendant may *not restrict or prohibit sales* of books of business by imposing heightened

requirements for its approval.  In its Motion for Summary Judgment, Plaintiff asserts that the

Court should declare that Defendant may not unilaterally impose heightened requirements for

sales of books of business between existing agents.  Specifically, Plaintiff argues that

Defendant's attempt to impose heightened requirements violates the express terms of the

Contract and that such imposition of heightened requirements is proscribed by the covenant of

good faith and fair dealing.  Defendant, however, argues in its motion for summary judgment that

the language of the Agreement and EA Manual gives Defendant the right to decide who may

purchase an economic interest in an Allstate agency and the right to amend the requirements for

prospective purchasers.  Defendant further asserts that because it did not breach any express

provision of the Agreement by communicating its book purchaser qualifications to the agents,

Plaintiff has no cause of action for breach of the implied covenant.

Section XVI.B of the Agreement governs transfers of interest under the Agreement.  It

states, in pertinent part:

> Agency has an economic interest, as defined in this Agreement and the
> incorporated Supplement and EA Manual, in its Allstate customer accounts
> developed under this Agreement.  Subject to the terms and conditions set
> forth in this Agreement and the incorporated Supplement and EA Manual,
> Agency may transfer its entire economic interest in the business written
> under this Agreement upon termination of this Agreement by selling the
> economic interest in the business to an approved buyer.  *The Company
> retains the right in its exclusive judgment to approve or disapprove such a
> transfer. . ..*

(Doc. No. 63 S-1, Exh. 5, pp. 7-8)(emphasis added).

The Manual, as issued in November 1999 with the Agreement and incorporated by reference into

the Agreement, is the document that speaks most explicitly to transfers of books of business

between existing Allstate agents.  On page 25, it states:

11

**Agency Sales Between Existing R3001 Agents**

A qualified R3001 Agent *may* be approved as a buyer of your interest in your book of business. The buying agent must meet the following business requirements:

- 65% or less adjusted, capped, paid casualty loss ratio
- Demonstrate the agency's ability to provide a proper level of customer service after the sale
- Commit to achieve Company business objectives for growth, multi-line sales and profitability
- Have a professional business relationship with Allstate

*Please note that the buyer is always subject to final Company approval.*

Id. at Exh. 8, p. 25 (emphasis added).

Section XXI.C of the Agreement provides:

This Agreement may not be modified except by a written agreement between the Company and Agency which expressly states that it modifies this Agreement. No other written statements, representations, or agreements and no oral statements, representations, or agreements will be effective to modify this Agreement. No representative of the Company will have authority to modify this Agreement, except as provided in this Section XXI. *Nothing in this Section will affect the Company's right to amend the Supplement, EA Manual, and Agency Standards, as provided in Section I.C.*

Id. at Exh. 5, p.10 (emphasis added).

The Court need look no further than the plain language of the Agreement to deny

Plaintiff's motion. Under the Agreement, transfers of interest require the "prior written approval

of the Company" and the Company "retains the right in its exclusive judgment to approve or

disapprove such a transfer." Id. at Exh. 5, pp.7-8. Further, the Exclusive Agency R3001

Supplement provides the Company "sole discretion" to approve a proposed sale and that the

Company's decision in that regard is "final." Id. at Exh. 7, pp. 1-4. In its supporting

memorandum, Plaintiff acknowledges that "the contract provides Allstate discretion in any given case to approve or not approve a transfer, even if the proposed buyer otherwise satisfies the basic requirements." (Doc. No. 60 at 14).

It is well settled that "'when the terms of a voluntary contract are clear and unambiguous, . . . the contracting parties are bound by those terms, and a court is powerless to rewrite the contract to make it more reasonable or advantageous for one of the contracting parties.'" Ernie Haire Ford, Inc. v. Ford Motor Co., 260 F.3d 1285, 1290 (11th Cir. 2001)(citations omitted). The clear and unambiguous language in this Agreement precludes a finding that Defendant breached the Agreement. See Burger King Corp. v. H&H Rests., 2001 U.S. Dist. LEXIS 24038, at **16-17 (S.D. Fla. Nov. 30, 2001) (holding that defendant did not breach the contract when it had "sole discretion" to determine whether a potential purchaser satisfied its standards); Burger King Corp. v. Ashland Equities, Inc., 217 F. Supp. 2d 1266, 1276 (S.D. Fla. 2002) ("[w]here [a party] has retained complete discretion in a Franchise Agreement to determine whether a prospective purchaser meets its qualifications for new franchisees, the contract bars [a] breach of contract claim"); Burger King Corp. v. Hinton, 203 F. Supp. 2d 1357, 1362 (S.D. Fla. 2002) (language reserving to Burger King Corp. "sole reasonable discretion" to determine the way in which it provides services in agreement bars breach of contract claim).

Plaintiff's members specifically agreed that Defendant would have final approval over transfers of books of business. Accordingly, this Court rejects Plaintiff's argument that Defendant breached the Agreement by changing the requirements for an existing agent to become an approved purchaser of an interest in an Allstate agency. Were the Court to accept this argument, the Court would be required to ignore the express language of the Agreement.

13

Nevertheless, Plaintiff contends that the contractual right to provide final approval in any given case is not the same as blanket permission to rewrite the general requirements applicable to all applicants or sales. Moreover, Plaintiff asserts that the language in the Agreement does not permit Defendant to unilaterally modify the specific requirements for transfers of books between existing agents. The Court notes, however, that language appearing in the EA Manual provides that "a qualified R3001 Agent may be approved as a buyer of your interest in your book of business" provided he meets certain requirements and receives "final Company approval." (Doc. No. 63 S-1, Exh. 8, p. 25). This language is clear: it provides that existing agents may be among the pool of qualified buyers, provided they meet business requirements and satisfy other criteria. Furthermore, Section I.C of the Agreement expressly states that "[Allstate] reserves the right to amend the Supplement, EA Manual, and Agency Standards at any time without prior notice." Id. at Exh. 5, p. 1. Under this provision, Defendant has the right to amend the requirements for prospective purchasers set forth in the EA Manual.

Finally, Plaintiff argues that Section XXI.C provides that the Agreement "may not be modified except by a written agreement between the Company and Agency . . .." Id. at Exh. 5, p. 10. However, the last sentence in the same paragraph preserves Defendant's right to unilateral modifications, stating that, "[n]othing in this Section will affect the Company's right to amend the Supplement, EA Manual, and Agency Standards, as provided in Section I.C." Id. Given the company's right to amend the EA Manual containing the purchaser guidelines, Plaintiff's arguments fail. Consequently, because there was no breach of the Agreement, Plaintiff's claim that Defendant has violated the implied covenant of good faith and fair dealing by amending the purchaser requirements for a book of business fails as a matter of law. The Eleventh Circuit in

14

Burger King Corp. v. Weaver, stated that: "[w]here a party to a contract has in good faith performed the express terms of the contract, an action for breach of the implied covenant of good faith will not lie.  More specifically, a cause of action for breach of the implied covenant cannot be maintained (a) in derogation of the express terms of the underlying contract or (b) in the absence of breach of an express term of the underlying contract." 169 F.3d 1310, 1318 (11th Cir. 1999); see also Ins. Concepts & Design, Inc. v. Healthplan Servs., 785 So.2d 1232, 1235 (Fla. 4th DCA 2001)("duty of good faith must relate to the performance of an express term of the contract and is not an abstract and independent term of a contract which may be asserted as a source of breach when all other terms have been performed pursuant to the contract requirements" and "should not be invoked to override the express terms of the agreement between the parties").  Defendant did not breach any express provision of the Agreement by amending its book of business purchaser qualifications, and as such, there can be no cause of action for breach of the implied covenant.  Accordingly, Defendant's Motion for Summary Judgment on Count I of Plaintiff's First Amended Complaint is **GRANTED**.  Plaintiff's Motion for Summary Judgment on Count I is **DENIED**.

### 2. Count III

In January 2000, Defendant developed and announced the creation of Results Expectations.  Under Results Expectations, agents are measured in three categories: (1) loss ratio, (2) property and casualty growth, and (3) Allstate Financial Services.  In Count III of its First Amended Complaint, Plaintiff seeks a judicial determination that Defendant may not unilaterally modify the Agreement by adding or increasing production quotas, otherwise known as Results *Expectations*.  Plaintiff asserts that the introduction and application of Results Expectations *and*

15

the pressure to satisfy Results Expectations constitute conduct by Defendant that is not permitted under the contract. Under Plaintiff's analysis, such quotas represent additional terms not contained within the Agreement and thereby constitute a breach of the Agreement, which only provided that agents must meet "certain business objectives." (Doc. No. 63  S-1, Exh. 5, p. 2). Additionally, Plaintiff argues that the quotas frustrate the reasonable expectations of the parties to the Agreement.

The Agreement provides that EAs are required to "meet certain business objectives established by the Company in the areas of profitability, growth, retention, customer satisfaction and customer service." Id. Additionally, EAs are required to "build and maintain a profitable book of business, assist the Company in its efforts to achieve market penetration for all forms of insurance offered by the Company and other Company Business." Id. Similarly, the EA Manual provides that "[t]he Company may establish business objectives . . . that you are expected to meet" with respect to growth, multi-line sales, profitability, and retention. (Doc. No. 63  S-1, Exh. 8, p. 6). The parties' Joint Statement of Undisputed Material Facts also reflects that Section II.B of the Agreement and page 6 of the EA Manual contain terms related to business objectives for EAs.

Nothing in the Agreement, the EA Manual, or the Supplement prohibits Defendant from establishing Results Expectations for agents. To the contrary, the plain language of the Agreement and EA Manual permits Defendant to establish a device to measure the agents' attainment of business objectives with respect to growth, retention, and profitability. Defendant's implementation of Results Expectations was within the contracting parties' reasonable expectations; the Agreement clearly states that EAs will be required to meet business

16

objectives established by Defendant in various areas.  (Doc. No. 63  S-1, Exh. 5, p. 2, Exh. 8, p. 6).  The parties are bound by the terms of the Agreement and EA Manual; therefore, the Court will not "rewrite the contract to make it more reasonable or advantageous" for Plaintiff's members.  See Ernie Haire Ford, Inc., 260 F.3d at 1290.  Such clear and unambiguous language precludes a finding that Defendant breached the Agreement.  As such, Plaintiff's allegation that Defendant breached the implied covenant of good faith and fair dealing likewise fails.  See Ins. Concepts, 785 So. 2d at 1232; Weaver, 169 F.3d at 1318; Burger King Corp., 169 F.3d at 1318. Therefore, Defendant's Motion for Summary Judgment on Count III of Plaintiff's First Amended Complaint is **GRANTED**.

### 3. Count IV

In Count IV of its First Amended Complaint, Plaintiff seeks a judicial determination that agents are not required to engage in or refrain from certain business practices.  Specifically, Plaintiff alleges that Defendant breached the Agreement by: (1) mandating hours of operation for its agents or their agencies; (2) mandating agent attendance at meetings; (3) restricting the ability of agents to make referrals; and (4) requiring agents or their agencies to maintain bank accounts at the agent's expense for Defendant's benefit.  Plaintiff relies upon language in the Agreement that states, "you will have full control of your time and the right to exercise independent judgment as to the time, place and manner of performing your duties . . ." in support of its argument that Defendant has attempted to exert a level of control over agents that is inconsistent with the language of the Agreement.  Both Plaintiff and Defendant seek summary judgment on this count.

17

**a. mandating hours of operation for business**

Plaintiff asserts that Section II.E of the Agreement provides the agent complete discretion concerning the hours which he or she will be present at the office. Section II.E of the Agreement provides:

> The Company recognizes that you may, in your sole discretion, arrange to have business conducted at your sales location in your absence by your own employees or other persons and that the time during which you are physically present at your sales location is entirely in your sole discretion. You must, however, remain actively involved in the conduct of business at your sales location.

(Doc. No. 63 S-1, Exh. 6, p. 2).

Plaintiff also cites to III.A of the Agreement, which provides the agent "sole and exclusive control over [its] labor and employee relations policies, and [its] policies relating to wages, hours and working conditions of [its] employees." Id. at Exh. 6, p. 3. Plaintiff argues that these sections are inconsistent with a provision in the EA Manual that states that the agency must maintain the service hours described in the Agency Standards because for those agents without other employees, the requirement amounts to mandatory office hours. Plaintiff asserts that this direct inconsistency between the Agreement and the Manual should be resolved in the agents' favor, and that the Court should declare that Defendant may not require mandatory office hours for agents without support staff.

However, section V.B of the Agreement and the Agency Standards further address any office hour requirements for Agents, and reconcile the provisions of the Agreement. The law is well established that "where provisions in an agreement appear to conflict, they should be construed so as to be reconciled, if possible." Arthur Rutenburg Corp. v. Pasin, 506 So. 2d 33, 34

18

(Fla. 4th DCA 1987); see also Triple E Dev. Co. v. Florida Gold Citrus Corp., 51 So. 2d 435, 438-39 (Fla. 1951). Section V.B of the Agreement provides that the agents agree to keep their "sales location[s] open for business as appropriate in the market" and "as a minimum . . . operate [their] sales location[s] consistently with the Agency Standards." (Doc. No. 63 S-1, Exh. 6, p. 4). The Agency Standards require agency offices to be open a minimum of 44 hours per week, from 9:00 a.m. to 5:00 p.m., Monday through Friday, with four additional hours to be scheduled at the agent's discretion (Doc. No. 57 at 18, citing Agency Standards at 8). While the agency must be open during these hours, the language only requires the agency to be staffed by a licensed employee of the agency, not the agent himself. These provisions are consistent with Section II.E of the Agreement, which provides that if the agent chooses to hire a licensed employee to conduct business the agent then has the discretion to determine the time periods he will spend at his sales location. This Court finds neither inconsistency among the provisions of the Agreement nor a breach of the express terms of the Agreement by Defendant's mandate of the agency's hours of operation.

### b. mandating agent attendance at meetings

Plaintiff further asserts that under Section II.I of the Agreement, Defendant may require the agent to meet with a Company representative on certain business topics, but that these meetings shall be at "mutually convenient times." (Doc. No. 63 S-1, Exh. 5, p. 3). Plaintiff admits that the EA Manual designates certain topics that may be the subject of mandatory meetings, but argues that Defendant has ignored both the limitation on topics which may be deemed mandatory as well as its contractual obligation to schedule meetings at "mutually convenient" times. Plaintiff asserts "there is simply no evidence that Allstate makes any serious

effort to schedule meetings at mutually convenient times and places.  This failure violates the contractual pledge that agents control their time and, more specifically, the requirement that any meeting with the Company be 'mutually convenient.'"  (Doc. No. 60 at 16).

In its Motion for Summary Judgment, Plaintiff is unable to offer any record evidence that any meeting – including a mandatory meeting – was not held at a mutually convenient time, nor does Plaintiff cite the testimony of agents who claim that the timing of a meeting was not mutually convenient.  Rather, the record reflects that Defendant offers more than one option for attending such meetings, albeit the agents' options may be limited to the choice of a morning or afternoon session on the same date.  Furthermore, neither the record nor Plaintiff's Motion for Summary Judgment reflect that Defendant has requested agent attendance at meetings on topics other than those mentioned in the EA Manual.  As such, there is no basis for the Court to enter judgment in Plaintiff's favor and the Court finds that Defendant did not breach the Agreement with respect to mandating agent attendance at meetings.

### c. restricting the ability of agents to make referrals

Since issuing the Agreement and EA Manual in November 1999, Defendant has announced a restriction that prevents agencies from offering or recommending specific claim vendors.  Plaintiff asserts that this restriction interferes with the manner in which the agents conduct their business and limits the agents' ability to build goodwill with customers or with mutual referral services.  Plaintiff further argues that this interference is inconsistent with the general pledges made concerning the agents' autonomy as independent agents, and as a result, the restriction impermissibly exceeds the scope of the Agreement.  Plaintiff therefore seeks summary judgment in its favor.  Defendant opposes Plaintiff's motion and also requests summary

20

judgment in its favor.

The Court first notes that Plaintiff fails to point to a provision in the Agreement that prevents Defendant from restricting referrals.[4] A review of the Agreement reveals that it does not restrict Defendant from limiting referrals; to the contrary, the Agreement provides that Defendant "will determine in its sole discretion all matters relating to its business and the operation of the Company," including "[t]he type and quality of customer service received by Company policyholders." (Doc. No. 63 S-1, Exh. 6, p. 2). Under this provision, Defendant contends that it has the right to restrict referrals – including the referral of vendors to policyholders – because referrals to substandard vendors can adversely affect the quality of service the customer receives and even result in legal liability. This Court agrees. The policyholders requesting referrals are Defendant's customers. A vendor referral to a policyholder certainly falls within a matter relating to Defendant's business and operation of the Company. As such, the restriction of referrals is within Defendant's sole discretion under the terms of the Agreement and does not constitute a breach of the Agreement.

---

[4] This Court is under no obligation to "plumb the record in order to find a genuine issue of material fact." Barge v. Anneuser-Busch, Inc., 87 F.3d 256, 260 (8th Cir. 1996). See also Jones v. Sheehan, Young & Culp, P.C., 82 F.3d 1334, 1338 (5th Cir. 1996) (holding that Rule 56 "does not impose upon the district court a duty to survey the entire record in search of evidence to support a non-movant's opposition); Barnhart v. Pickrel, Schaeffer & Ebeling Co., 12 F.3d 1382, 1389 (6th Cir. 1993) (noting that "trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact"); United States v. WRW Corp., 986 F.2d 138, 143 (6th Cir. 1993) (stating that "trial court is not required to speculate on which portion of the record the non-moving party relies, nor is there an obligation to "wade through" the record for specific facts"); Kraus v. Celotex Corp., 925 F. Supp. 646, 649 (E.D. Mo. 1996) (concluding that trial court is not "obligated to wade through" the record).

### d. requiring agents or their agencies to maintain bank accounts

Plaintiff's final Count IV allegation is that Defendant breached the Agreement by requiring agents to incur banking costs associated with new bank accounts required by the Company. The record evidence fails to demonstrate that there has been one instance in which an agent was not reimbursed for these banking costs. Plaintiff admits that Defendant has reimbursed agents for these costs, but argues that Defendant did so only after temporarily suspending the agency remittance project. Plaintiff asserts that the parties need a declaration from the Court to resolve their respective rights on this issue under the contract. notwithstanding the fact that the actions upon which this allegation is based have never occurred. Under these circumstances, the Court finds Plaintiff's claim presents no cognizable case or controversy.

The Declaratory Judgment Act, 28 U.S.C. 2201, provides in pertinent part that: "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." The test to determine if there is an actual controversy, one ripe for decision, under the Declaratory Judgment Act was set forth in Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270 (1941). "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant issuance of a declaratory judgment." Id. at 273. Plaintiff's final allegation in Count IV that Defendant breached the Agreement by requiring agents to incur banking costs associated with new bank accounts required by the Company does not present a case or controversy as it lacks *sufficient* immediacy and reality.

22

For the reasons discussed herein regarding each allegation in Count IV, Defendant's Motion for Summary Judgment on Count IV of Plaintiff's First Amended Complaint is **GRANTED**, and Plaintiff's Motion for Summary Judgment is **DENIED**.

### 4. Count V

In Count V of its First Amended Complaint, Plaintiff seeks a judicial declaration that Defendant may not implement compensation changes without first providing ninety days advance notice. Both Plaintiff and Defendant seek summary judgment on this count.

The Agreement discusses compensation in Section XV.A, which states:

> The sole compensation to which [Agency] will be entitled for services rendered pursuant to this Agreement will be the commissions set forth in the Supplement, as may be amended from time to time.... However, due to the inherent uncertainty of business conditions, the Company reserves the right to increase or decrease any commission amounts and to change the commission rules. If the Company changes *commission amounts*, it will provide [Agency] with written notice of the changes at least ninety (90) days prior to the date on which they are to become effective.

(Doc. No. 63 S-1, Exh. 6, p. 6)(emphasis added).

The contract between Defendant and its agents authorizes Defendant to change commission rules and commission amounts. However, ninety (90) days written notice is required for changes in commission *amounts*. In late 2001, Defendant introduced a new policy, effective January 1, 2002, under which Defendant would "charge back" certain commissions previously paid to agents for "controlled business"[5] or universal, variable, or whole life insurance, when the insurance was decreased or terminated within three years of issuance. Plaintiff argues that this

---

[5] Controlled business is business written on one's self, spouse, child. member of household, or father or mother. (Doc. No. 62, ¶25).

policy and a December 13, 2001 memorandum, which announced a series of "charge backs," communicated a change in commission *amounts* rather than a change in a commission *rule*. Thus, Plaintiff argues, the change required 90 days notice. Plaintiff asserts that the change was announced and implemented within a nineteen-day period, as opposed to the ninety-day written notice period required for changes in commission *amounts*.

Defendant foremost argues that the record evidence demonstrates that Defendant has not imposed a "charge back" under this policy against any agent in Florida. Thus, Defendant argues, even if the announced policy constituted a change in commission amounts, Defendant has not breached the contract because agents have had far more than ninety days notice. Additionally, Defendant asserts that Plaintiff's allegation that Defendant changed a commission amount, rather than a commission rule, is incorrect. Defendant states that it is clear from the content of the EA Supplement, which sets forth commission rules and amounts, that the term commission "amounts" refers to commission rates paid on the products EAs sell and service. Defendant offers examples, such as the Supplement, that provide that "[t]he current commission amount for Florida Select Insurance Company business is 8%." (Doc. No. 58, S-4, Exh. 4, p. 3-3-7).

Because the Court finds that any imposition of a "charge back" was a change in a commission rule rather than a change in commission amount, Plaintiff's claim in Count V fails. As Defendant points out, the EA Supplement indicates that the term commission "amounts" refers to commission *rates* – the percentage of the premiums agents will be paid upon the sale of an insurance policy or product. These commission amounts are set forth in commission schedules. See id. at p. 2-1d-1. However, the term commission *rules* refers to the *policies* that govern the manner in which these commissions will be calculated or paid to the agents. For

24

instance, the policy that requires that agents will receive a "charge back" or a commission deduction when an insured terminates a policy either six months prior to or within twelve months after the policy date of a replacement policy is a commission rule – it governs the manner in which a commission will be paid or deducted rather than the actual numerical percentage an agent will receive or be charged. See id. at p. 3-4b-1, 2. In light of the language contained in the EA Supplement, the Court finds that Defendant's policy regarding "charge backs" is a change in a commission rule rather than a commission amount. As such, Defendant did not violate the terms of the contract when it failed to provide 90 days written notice of this policy change. Therefore, Defendant's Motion for Summary Judgment on Count V is **GRANTED**. Plaintiff's Motion for Summary Judgment on Count V is **DENIED**.

### C. Fraudulent Inducement

In Count II of its First Amended Complaint, Plaintiff seeks a judicial declaration that Defendant fraudulently induced Allstate agents to enter into the Agreement. Specifically, Plaintiff asserts that Defendant promised agents an ownership interest in their books of business – an interest that could be bought and sold – as the primary incentive for agents to enter into the Agreement. Plaintiff contends that at the time Defendant made these representations, Defendant knew that it did not intend to allow sales as represented and that it planned to place severe limitations on buying and selling books of business. Additionally, Plaintiff argues that Defendant had an obligation to disclose its plans to change requirements applicable to sales to the current agency force when Defendant was promoting the Agreement to the agents. In its Motion for Summary Judgment, Defendant argues that Plaintiff's claim must fail because the requisite elements for fraudulent inducement are not satisfied.

25

The elements of a claim for fraudulent inducement are: (1) a false statement concerning a material fact; (2) the defendant's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reasonable reliance on the representation.  See Johnson Enters. of Jacksonville, Inc. v. FPL Group, Inc., 162 F.3d 1290, 1315 (11th Cir. 1998).  The requirement of "false statement" includes material misrepresentations or omissions of fact.  Bradley Factor v. United States, 86 F. Supp. 2d 1140, 1146 (M.D. Fla. 2000).

Because Plaintiff has not satisfied the first element necessary to state a claim for fraudulent inducement, its claim against Defendant fails.  There is a lack of record evidence to support Plaintiff's claim that Defendant made any false statement or material omission regarding the terms under which the agents could sell their economic interest in their books of business.  Defendant admits that the agency force was advised that they would develop an economic interest in their books of business that they could sell.  Defendant further asserts that this representation was truthful when it was made and that it remains truthful.  The record before the Court supports Defendant's position.  The record reflects that hundreds of agents have sold their economic interest in their books of business during Preparing for the Future – an option that was unavailable to agents when they were employees – and that these agents continue to sell their economic interest in their books of business.  For instance, between April 1, 2001 – the effective date of the revised guidelines – and November 1, 2002, 107 agents sold their economic interest in their books of business to Allstate-approved purchasers. (Heffron Dec. ¶ 3).  Furthermore, record evidence provides examples of agents making significant profits on these sales. (Franz Depo. at 47)(stating that he sold his economic interest in his book of business for $1.85 million -

including interest on financing - in July 2002); (Massaro Depo. at 41-43)(testifying that he purchased an economic interest in four books of business in December 2001 for over $900,000); (Stern Depo. at 59)(stating that his economic interest in his book of business is currently on the market for $750,000).[6]

Furthermore, clear language in the Agreement gives Defendant the exclusive judgment to approve or disapprove sales. The Agreement also incorporates the EA Manual, which permits Defendant to amend the purchaser requirements. As the Court previously discussed in its analysis of Count I, the Agreement – which was signed by every agent – supercedes any prior written or oral representation and clearly states that any buyer of an agency is always subject to final Company approval and that the Company may approve or disapprove a buyer in the Company's "exclusive judgment," even if the proposed buyer otherwise satisfies the basic requirements. Thus, Defendant's decision to modify the requirements for transfers of books of business was in accordance with its rights under the Agreement. Additionally, the record evidence does not reflect that Defendant made any false representations or material omissions regarding such transfers.

This Court finds that Plaintiff has failed to establish the first element necessary to state a claim for fraudulent inducement. Where there is no "clear evidence that a false statement was actually made," a fraudulent inducement claim fails as a matter of law. In re Crown Auto Dealerships, Inc., 187 B.R. 1009, 1016 (Bankr. M.D. Fla. 1995) ("To prove a cause of action

---

[6] Plaintiff's Fed. R. Civ. P. 30(b)(6) witness testified that Plaintiff does not maintain any record, information, or statistics on the sales of economic interests in books of business or the price that economic interests in books of business have brought on the open market. (Mathison Depo. at 135).

based on fraud, there must be clear evidence that a false statement was actually made.  Absent

such clear evidence, the claim must fail.")  Accordingly, Defendant's Motion for Summary

Judgment on Count II of Plaintiff's First Amended Complaint is **GRANTED**.

### D. Violation of Florida Franchise Act

In Count VI of its First Amended Complaint, Plaintiff seeks a judicial declaration that

Defendant's conduct violated the Florida Franchise Act, F.S. § 817.416 ("Act").  Plaintiff alleges

that as a result of Defendant's unilateral modifications of the requirements for transferring a book

of business, Defendant misrepresented to its agents their chances of success for both existing and

proposed franchises, in violation of the Act.  Plaintiff also alleges Defendant violated the Act by

terminating agents who fail to meet Results Expectations and by requiring agents to assume a

portion of Defendant's banking expenses.

Section 817.416(2)(a)(1), Florida Statutes, provides in part:

> (a) It is unlawful, when selling or establishing a franchise or
> distributorship, for any person:
>
> 1. Intentionally to misrepresent the prospects or chances for
> success of a proposed or existing franchise or distributorship;
>
> 2. Intentionally to misrepresent, by failure to disclose or otherwise,
> the known required total investment for such franchise or
> distributorship

Both parties cite to dicta from Travelodge International, Inc. v. Eastern Inns, Inc., 382 So. 2d 789

(Fla. 1st DCA 1980) in support of their positions.  In Travelodge, the plaintiff franchisor sold to

the defendant corporation a franchise to operate a motel in Florida.  See id. at 790.  To induce the

defendant to enter into the transaction, plaintiff made representations concerning its plans for the

development and expansion of the motel network and system.  See id. at 792.  Plaintiff's

28

program was not implemented as represented, and defendant's motel franchise suffered

pecuniary losses.  See id. at 791-92.  Approaching bankruptcy, the defendant converted to

another system and terminated the franchise.  See id.  The court affirmed judgment for the

defendant on its counterclaim under the Act.  See id. at 793.

> Interpreting the Franchise Act, the court stated:
>
> "The statute . . . concerns itself with what is said today about what
> probably or most likely will happen tomorrow.  If the total effect of
> [the plaintiff's] conduct was to intentionally misrepresent what would be
> the probable or most likely prospects for success of the motel enterprise,
> based upon the facts and circumstances which were known by [the plaintiff].
> it may be liable for damages under this statute.  We hold that recovery
> under the statute may be had upon proof of *intentional* words or conduct
> by the franchisor, concerning the prospects or chances of success of the
> enterprise, which were relied upon by the franchisee to his detriment, and
> which are not in accordance with the facts."

Id. at 791 (emphasis added).

In the case at bar, Plaintiff has failed to demonstrate that Defendant made any statements

concerning the agents' prospects or chances of success, that were relied upon by the agents to

their detriment, and that are not in accordance with the facts.  As discussed by the Court in Count

II, the record evidence reflects that Defendant informed the agency force that they would develop

an economic interest in their books of business that they could sell; furthermore, the record also

reflects that hundreds of agents sold their economic interest in their books of business during

Preparing for the Future, an option that was unavailable to agents as employees, and that these

agents continue to sell their economic interest in books of business, often at sizeable gains.  In

Travelodge, the franchisee's lack of success, under the Travelodge license, was clearly

29

demonstrated by the defendant.  See id. at 791.[7]  Plaintiff has not provided any such evidence in this case.  Accordingly, the Court cannot find that Defendant violated the Act by intentionally misrepresenting the prospects or chances for success of a proposed or existing franchise.

Plaintiff, however, further alleges that Defendant violated the Act by intentionally misrepresenting, by failure to disclose, the known required total investment for the franchise.  Specifically, Plaintiff asserts that Defendant unilaterally and unforeseeably increased agents' costs by mandating office hours and meetings, which forced agents to maintain additional support staff, and by attempting to pass its banking costs to the agents through the Agency Remittance Program.  Plaintiff asserts that none of these added costs were described to the agents at the time of the conversion process.  The Court, however, finds this argument unpersuasive.  As discussed throughout this Order, in setting hours of operation and mandating meetings the Defendant was merely exercising its rights under the Agreement.  As such, Plaintiff's argument that the increased costs were unforeseeable fails.  Furthermore, it is unsupported by the record evidence.

Plaintiff's claim under the Florida Franchise Act fails because Plaintiff has failed to set forth evidence that Defendant engaged in conduct that gives rise to a violation of the Act.  Therefore, Defendant's Motion for Summary Judgment on Count VI of Plaintiff's First Amended Complaint is **GRANTED**.

---

[7]  In Travelodge, the record reflected that the "expansion plan actually never got 'off the ground' so to speak, and the evidence at trial conclusively proved that the 'plan' itself was thereafter abandoned."  Travelodge, 382 So. 2d at 792.  "Daily occupancy [at the hotel] was extremely poor, the average for the first eight months being 27.6 %."  Id. at 791.

Accordingly, it is **ORDERED AND ADJUDGED** that:

(1) Defendant's Motion for Summary Judgment (Doc. No. 55) is **GRANTED** as to all counts of Plaintiff's First Amended Complaint.

(2) Plaintiff's Motion for Summary Judgement as to Counts I, IV, and V of its First Amended Complaint (Doc. No. 59) is **DENIED**.

(3) The Clerk is directed to enter judgment for Defendant, terminate any pending motions, and close this case.

**DONE AND ORDERED** at Tampa, Florida, this _20th_ day of April, 2003.

SUSAN C. BUCKLEW
United States District Judge

Copies to:
Counsel of Record

31

F I L E   C O P Y

Date Printed: 04/23/2003


Notice sent to:

____   James E. Felman, Esq.
       Kynes, Markman & Felman, P.A.
       P.O. Box 3396
       Tampa, FL  33601-3396

____   Dirk A. Beamer, Esq.
       Wright Penning, P.C.
       27655 Middlebelt Rd., Suite 170
       Farmington Hills, MI  48334

____   Kevin A.S. Fanning, Esq.
       Wright Penning, P.C.
       27655 Middlebelt Rd., Suite 170
       Farmington Hills, MI  48334

____   Lori J. Caldwell, Esq.
       Rumberger, Kirk & Caldwell, P.A.
       201 S. Orange Ave., Suite 300
       P.O. Box 1873
       Orlando, FL  32802-1873

____   Joel M. Cohn, Esq.
       Akin, Gump, Strauss, Hauer & Feld
       1333 New Hampshire Ave., N.W., Suite 400
       Washington, DC  20036-1511

____   Robert G. Lian Jr., Esq.
       Akin, Gump, Strauss, Hauer & Feld
       1333 New Hampshire Ave., N.W., Suite 400
       Washington, DC  20036-1511

____   W. Randolph Teslik, Esq.
       Akin, Gump, Strauss, Hauer & Feld
       1333 New Hampshire Ave., N.W., Suite 400
       Washington, DC  20036-1511

____   Jeffrey P. Diamond, Esq.
       Rumberger, Kirk & Caldwell, P.A.
       100 N. Tampa St., Suite 2000
       P.O. Box 3390
       Tampa, FL  33601-3390